All in Case 16-5559 RQSI Global Asset Allocation Master Fund LTD v. APERCU International PR LLC et al. Oral argument not to exceed 15 minutes per side. Mr. Dyke for the appellant. May it please the court, counsel, and your honors, I have asked to reserve two minutes for my rebuttal. This appeal comes before the court as the result of the granting of a motion which this court has described as a disfavored motion which should be rarely granted, the 12B6 motion to dismiss for failure to state a claim upon which relief can be granted. The standard of review is therefore, as the court well knows, de novo, which means that the role of the district court opinion is one of reference but not of deference. The standard for this review is familiar to the court, but I think it is important to just recite it nonetheless because sometimes out in the field it seems like it is recited not followed and I would submit this was one of those instances. All the facts in the complaint must be assumed as true. The facts must be construed in the light most favorable to the plaintiff. All inferences must be drawn favorable to the plaintiff. The complaint must be read sympathetically to the plaintiff and just because the court may believe that it may not ultimately be proved is not a grounds for granting the motion. Now, I may only remember one thing that a professor of mine said in law school verbatim and it was my civil procedure professor who said, what makes a good complaint? Well, you can't just drool on the page. The United States Supreme Court has ultimately adopted that in the Iqbal and Twombly cases which provide that you must plead sufficient facts to state a claim for relief that is plausible on its face. Here, this complaint is chock full of facts that go well beyond the plausibility standard. What do those facts say? What kind of picture do they portray? We had a trading agreement between a fund and an advisor pursuant to which simply stated once the fund decided to terminate the program, the advisor went rogue. He started trading wildly against the express instructions of the client and violating the express terms of the trading agreement and not only did he go rogue, he lied about it to the client. Ultimately, the client terminated the agreement and brought this action. The complaint was attacked really in two ways. The first way was an argument that all damages had been waived by a provision in the trading advisory agreement. The second way was even if some damages were recoverable, that the causes of action had not been sufficiently pled. Throughout the case, the damages component has been argued and dealt with first. I think it may make more sense to go first to the adequacy of the pleading of the causes of action. The causes of action pled were for gross negligence, fraud, fraud by omission, and breach of contract. We readily assent that under section 8 of the trading advisory agreement, in order to hold the advisor liable, we must show that these losses were caused by the gross negligence or willful misconduct of the advisor. Did you plead that in the complaint? We did indeed. We pled it very expressly, your honor, multiple times and one of the things that the district court did, especially with regard to the gross negligence claim, was conclude that we had not sufficiently pled malice, which is required by Kentucky law, the Phelps versus Louisville Water Company case, for example, to support a claim of gross negligence, which is just incorrect. Federal rule of civil procedure 9, even post-Iqbal Twombly, allows malice to be averred generally, and we did that. We averred malice generally in paragraphs 64, 71, 77 of the complaint, but we did much more than that. Did you use the word malice? We did use the word malice, so we satisfied the general averment standard, which really ought to be enough, but we went beyond that. You said 64, 71, and 77, your honor. 71 and 77, okay. I think you said 67, but good, because I see it in 64. I was just headed down the complaint. 64, 71, and 77. That's correct. Yes, I see malice in 71 and I presume I'll see it in 77, yes. Malice for it all. That should be enough under the rule, but we went well beyond that under the Iqbal Twombly standard, in that we pled facts from which an inference of malice could also be drawn, and the court didn't draw that inference in our favor, as is required under law. For example, the court, and this is something that the court missed, said that there could be no malice because we might share in the upside of this rogue trading. Well, perhaps we could share in the upside, but we were the only party that would have the downside. The advisor got a 20% of the upside, but had no liability for the downside, so we submit you can definitely draw an inference of malice from the fact that he was told his program was being ended, and then he goes rogue, saying, well, what the heck? I've only got the potential for the upside here. I'm going to roll the dice and try and make a big hit. You say the program. Is that the whole of everything the advisor was doing, or where does this, quote, embedded tail hedge come in? Well, the program... Not really relevant. It's just such a great phrase. I was trying to figure out what it was. No, actually, the embedded tail hedge is relevant, and it was part of the program that was presented to the client. By program, we mean here are the elements of a trading strategy, and one of them is going to be this embedded tail hedge, which basically means that the investments will perform well if the equities markets don't, and that was an affirmative representation. Well, when things start going bad, and the client starts confronting the advisor with the fact that margin has busted through the contractual limits, that the losses, day-to-day losses are mounting, and that instructions are not being followed, one of the things he says, oh, well, there's the embedded tail hedge there, so we'll be protected, but that is a fraudulent statement. Part of the going rogue is not just what he did do, but you're saying it's what he didn't do. Definitely, definitely, Your Honor, and that goes to both the fraud, because he told us certain things, and it also goes to the breach of contract claim. We allege the district court's opinion doesn't contain any analysis really whatsoever of the breach of contract claim. It just says it was inadequately pled, but the complaint pleads specific provisions that the margin threshold had been exceeded, that it hadn't been corrected within the time period required by the contract, that the elements of the trading program had been materially changed, and now, Your Honors, we know from the Commodities Futures Trading Commission action in the Northern District of Illinois, which admittedly was commenced after the dismissal here. We've cited the court's two authorities, which would, the court can take judicial notice of this, and in an abundance of caution yesterday, we filed a late motion, admittedly late, of the judgment that's been entered in that action, which provides additional evidence of malice, which could be considered on remand of this case. In that, in a separate matter, Mr. Wilkinson, the appellee ... You just said it can be considered on remand, but not in deciding whether to remand. No, I would submit it can be considered in that under 28 U.S.C. 2106. The grant of this court's appellate jurisdiction says that a remand can occur for circumstances that justice requires. Then the Firestone Bridge Stone case ... Isn't that really kind of ad hominem? You're saying the FTC has subsequently found this guy is a bad guy, therefore we should find he's a bad guy for earlier things? No, it's ... That's kind of ad hominem, doesn't it? There's not really an ad hominem element to it, because we're relying on specific facts. If I was just saying, he's a bad guy, he's a bad guy, with nothing supporting, this provides another basis for an inference of malice, because he had this Ponzi scheme blowing up at the same time that is the subject matter of the CFTC action and the judgment in the Northern District of Illinois, which is another reason why he decides to take the gamble and go rogue, shooting for the upside only. Now I should probably turn briefly to the second argument on which the complaint was with what damages are recoverable. So presume we've met the pleading threshold on our causes of action. The second argument advanced by the defendants was that all the damages have been waived by Section 2 of the Trading Advisory Agreement. That section, distilled to its basically the margin call that occurred. We argue that Section 8, later in the agreement, contains a carve out for that if the damages were caused by the gross negligence or willful misconduct of the defendant. The district court basically decided to split the difference on this. Appellees say we can't recover any damages. We say we can recover all the damages we claim, including the margin call. The district court said you can't recover for the margin call, but you can recover your other claim damages for trading losses, lost management fees, the costs of cleaning up the mess, opportunity costs, etc. I will concede that while we're arguing for a broader interpretation of the contract, the district court's interpretation of the contract is a reasonable one. We simply contend that all the damages we've claimed, which include the margin call, are recoverable under Section 8. The Section 2, Section 8 is not a textbook example of great drafting, perhaps, but when you work to harmonize the two sections, we believe that the gross negligence, willful misconduct provision in Section 8 is a carve out and we can claim any damages, including for the margin call, if they were caused by the appellee's gross negligence or willful misconduct. Our primary claim here is that the district court did not correctly apply the standard for review of a motion to dismiss for failure to state a claim. We didn't get the benefit of the favorable reading of the complaint. We didn't get the benefit of a varying malice generally. We didn't get the favorable inferences that are required. We have pled well beyond the plausibility threshold of Iqbal and Twombly. We also believe that the court was right that we can recover all damages other than the margin call. We believe that did not go far enough that we can actually recover the margin call as well, but at minimum, the court was correct in deciding that we could recover the other damages that we've claimed. I do have just one tangential question. It may not even be important at this juncture, but the complaint uses the term risk many spots. Risky strategy, risky exposure, adding further risk, things of that nature. To the extent we must examine whether some sort of definition of the term risky, do we look at the TAA, do we look at the industry in general? Does that make sense? Yes, indeed it does. For purposes of this motion, your honor, I think you would accept our allegations as to risk as correct, but there are two more or less objective sources of evidence on risk that will be presented upon remand when the matter proceeds to the court. The first one, value at risk, that's where we see VAR. The second one, is that VEGA or is that something else? VEGA is something else, your honor. You're going to require me to resort to my glossary, which I prepared for the oral argument. It's not really a risk measure. Let's skip that one, but what you call the internal risk report, what document would we look at for that? Those documents are not in the record yet themselves, but they are pled and I believe that even the appellees will concede that Mr. Wilkinson and Appersu maintained internal risk reports. My paragraph is, would those be pled in, would you know of? If not, we can find out. I will look it up and advise the court during my rebuttal if that's satisfactory. Would you have the same answer in terms that we see all the time in cases involving trading and securities investments, but liquidity and positions that are excessively large, same sort of answer in terms of to which we would look to how to understand those. I understand, I think you're getting at the fact that there may be an inherent subjectivity in some of those terms and that may go to whether the fraud claim can be sustained because of representations as to facts, but on virtually all of these things, and if you would look at the charts attached to the first amendment complaint, there are methods by which the people who are involved in this industry quantify and compare those things. At this stage of the proceeding, I think our pleadings to that point should be accepted as true. Okay, that's helpful. Thank you very much. May it please the court, counsel. My name is Jeff Mode and I represent Appersu and Mr. Wilkinson in this matter. The district court properly dismissed all claims in this dispute between sophisticated parties to a contract governing a high-risk trading strategy for three different reasons. The first is that fraud claims require facts, objective, pasture-present, concrete, testable facts, and the complaint does not allege that Wilkinson or Appersu misrepresented any of them. There is some external report, I think, that shows that there was no embedded tail hedge. The allegation there is that Wilkinson shared an internal Appersu risk report with RQSI and that internal risk report was inaccurate. That's the allegation. Not that it was falsified. Not that anybody did anything to deceive anyone. They shared their internal risk reports which showed that in the future the strategy would be profitable in a large market downturn. That turned out to be incorrect. But there's no allegation that Wilkinson or Appersu misstated the contents of the report or that anyone doctored any objective data. The part about the embedded tail hedge, in the internal report and no place else, I thought there was an explicit representation, or they say there was, that they would use this strategy. Whether it's a good strategy or not, I don't know. But that it said they would do it and they didn't do it. Where am I missing it? I'm not exactly sure where you're talking about. The allegations concerning the embedded tail hedge are in paragraph 67 and 69 of the complaint. Yeah, because I thought that was one of the sort of positive features. This is 67. Wilkinson represented to the fund that internal risk reports supported the claims that the strategy contained an embedded tail hedge such that it would be profitable. Correct. And there's no allegation that that statement was incorrect. So Wilkinson represented that Appersu's internal reports supported that there was an embedded tail hedge. There's no allegation that the reports didn't actually support that. So you're saying that they weren't going to do it, they didn't do it, but they did have a risk report that said they were going to do it. There's no allegation that there was an action that they were going to do it. And 69 says Wilkinson's representations turned out to be false. Right, but there's no statement that could have been true. He shared... ...that the strategy supported the claim. Okay, so you're saying regardless of what we said in the report, we're okay if we never intended to do it, we never did do it, that's all they allege. It's not that we never intended to do anything or we never did anything. They're saying that embedded tail hedge is a quality of the strategy that makes it such that the strategy would The allegation is that we shared the actual contents of our own internal risk reports and that our reports just in the future with hindsight, based on their own experts' reviews, turned out to be, or it turned out that that couldn't have been accurate. But I don't think there's any allegation that anybody... Are we talking past each other? They never did try to use the embedded tail hedge. I don't think it's a matter of whether they're trying to use the embedded tail hedge or not. I think the issue is the embedded tail hedge just shows that the strategy should be profitable in a large market downturn. And they're saying that... I think they're trying to use the falsified facts exception to state a fraud claim there because if I just... If you're my security analyst, security, not securities, and you say I'm going to protect your house by putting these sensors in the lawn and here's our report that shows we have an internal report that shows that this will protect you, and then they never do it. Isn't the representation that this is in our plan a representation that we're going to do it? I don't know that the analogy between something that you plan to do to somebody's house and something that is present in a strategy hold up. The embedded tail hedge was something that should have existed according to our reports as alleged by the complaint, should have existed by market factors. It was Wilkinson and his team's, Appersu team's, interpretation of market factors that showed that there was an embedded tail hedge that sometime in the future, if there was a large market downturn, the strategy would have been profitable. We didn't just have a lever that showed that... We didn't have a lever we could pull that in the event that the market turned down that we would just make money. I think the allegation was more about the quality of or a feature of the trading strategy as it stood at the time. So, moving on to... What's this tail hedge supposed to be doing? Is it supposed to eliminate the losses or at least minimize the losses? Well, unfortunately we're limited to what we have in the complaint and you'll have to ask my co-counsel about the individual... What is it in general? What is that? As alleged in the complaint, an embedded tail hedge... Well, in general, I just want to know what... I assume that that's some kind of a phrase that securities people use all the time. It's supposed to minimize losses by the investor or... As alleged in the complaint, it says that the strategy will profit during a market downturn and that's all we have. Will profit if there's a downturn. Correct. So, what you're really saying is that the allegation and the risk report sounds specific but it really isn't. That it's just the same as saying we'll make you money. It's the same thing we see on TV. This strategy will make you money in an up market or a down market. That's correct. There's no specificity beyond that. That's correct. Okay. And I also think it's just not a false statement. We shared our reports. Our reports turned out to be inaccurate. Our reading of market factors turned out to be inaccurate. Moving on to a couple of these other fraudulent misrepresentation claims. The first claim concerns Wilkinson's interpretation, again, of market factors that caused an increase in margin. He believed it was a temporary issue with valuation and he thought that we needed to add more hedging trades. That belief and prediction, with hindsight, turned out to be incorrect. But as the Kentucky Supreme Court in the Flagle's decision determined, business people and investors need to be able to analyze market factors and make a judgment about what's going to happen in the future or what's happening now. So that first statement fails because it's not a concrete fact and it doesn't contain specific past or present allegations that are testable, capable of being true or false. The third allegation, I believe, was touched on a little bit in my opposing counsel's discussion and that's about ample liquidity existing. As Judge Simpson's opinion pointed out, whether ample liquidity exists is not something that can be proven true or false. It's not testable. It's a matter of opinion. Judge Simpson properly dismissed that claim for two different reasons. Number one, whether liquidity is ample is a subjective opinion. Number two, whether a position can be efficiently exited over the course of a few weeks is also a subjective opinion. Quickly moving on to the fraudulent omission claims, there are two of them. One is that Wilkinson was aggressively adding to the risk. This is another thing that came up during my opposing counsel's argument. There's no measure here alleged in the complaint that was objectively and testably misrepresented or omitted. Wilkinson did not omit the level of the risk because, well, first off, in the terms of the TAA, they acknowledged, everyone acknowledged, that this was a risky strategy, that they could have lost more than their initial investment. But in addition, if by risk they mean initial margin requirement, which is something that came up in their briefs and wasn't talked about in the argument, there's no allegation that they didn't have access to and real-time knowledge of the initial margin requirement on every day. By initial margin requirement, is that the same as the margin limit, the million-dollar margin limit? Yes. And isn't there an allegation that that was breached? That's right. And that's one of their breach of contract allegations, breach of Schedule A. And the allegation there is that because margin exceeded a million dollars, then we should be liable for any damages that result because of that. Well, if you read Schedule A, a million-dollar margin limit was not a hard cap by any means. RQSI maintained the authority to let it rise, let it fall, and while they allege that they never gave the specific instruction that margin should be increased, in fact, they allege the opposite, they did allege that they are the ones who discovered the margin was rising in July, and they are the ones who had real-time knowledge of the margin requirement as it was rising. They also allege that their profits were rising in the same period. So, basically, they're watching this margin go up for months, and they're watching their profits rise with it. Our position is that they cannot sit back and watch their margins rise with the profits when the strategy gave them, the TAA Schedule A gave them the right to cancel the agreement and hire someone else to handle it, the moment the agreement went above a million dollars. So they decided not to exercise that right, and that decision shouldn't be... Is that simply a waiver argument in the sense of standard contract? In fact, if you keep on repeatedly waiving a breach, maybe eventually, although usually the contract law is that allowing a breach doesn't obviate the later breach. Isn't that right? That's right, but I think the issue here is about the terms of Schedule A. The terms of Schedule A say, give them the explicit right to... When you say the terms of Schedule A, is that keyed to a portion of the agreement itself? That's correct. Schedule A is attached, it's after the paragraphs end to the agreement. But then is there something that says, and therefore you shall look to Schedule A, oh, this is that includes the million. That's right. And then it just says, all right, and so what do you rely on? The maybe increase to as much as three million? Or more or less. Or decrease, but increased or decreased sounds like something you put in a document or at least a phone call. Right, but what we're talking about here is that Schedule A also says that in the event that margin exceeds a million dollars, we're to use our best efforts. And if we're unable to get it below a million dollars, and they allege that we were either unwilling or unable to do so... Within one trading day, right? Within one trading day, then their remedy was to terminate the TAA. And it's our position that it could not be intentional misconduct or gross negligence for us to continue trading with the margins rising as they decline to exercise their right to terminate the contract. You're saying they had to do it as soon as they saw it that day? That day or any time thereafter. I'm saying they can't wait until the most volatile week in the S&P 500 and, you know, a period of years to lose some money and then sue us for it. I mean, it doesn't say that they must do this or it's waived. It's, in fact, in pretty passive voice. Failure to the advisor may result in the allocation being temporarily suspended or permanently terminated. It doesn't say that they have to. It doesn't say when or how they do it. Again, your adversary may have been right when he said this wasn't the best drafted agreement, and you probably say the same. That's right, and we can't dispute that. But our position is that that still has to be. Okay, but that's really the sentence you're relying on, and it says, hey, you guys have all the power here, and if you don't do it, we'll just keep doing it. We're a very sophisticated party, and you can only sue us for gross negligence or willful misconduct. Looks like I have less than a minute left. I'd like to make just a couple quick points. Number one, their gross negligence vendetta theory that we, as soon as they figured out that they were canceling the agreement, we went rogue and started adding risk immediately thereafter. The timeline doesn't add up. They decided to cancel the agreement in April. We found out about it in May, and the strategy remained. They alleged that the strategy remained even for about a year or two. Number two, the CFTC allegations can't be considered at this point. I'd direct the court to the Hadley case, which we cited in our briefs, and then United States v. Bonds is 12F3DF40. It's 12F3DF40. So finally, my time's up. I appreciate the court's time. The district court's order should be affirmed. I've got to ask one short question here. Absolutely. In that Schedule A we were talking about, the language we're focusing on seems to say, well, if we do this, then you could terminate the contract. As I understood it, they could terminate it in general. That this doesn't add a right to the client, and maybe that's why it's couched so passively. It's more of a warning to you that if you do this, it may cause them to invoke rights they already have. Is that fair? I think it's a warning to both parties. If the initial margin exceeds a million dollars, they have the right to terminate the contract. Well, if you agree, they have the right to terminate the contract anyway. That's right. But we have, once again, Section 8, I think, ties in with Schedule A, and Section 8 says they can only sue for gross negligence or willful misconduct. Thank you. Thank you all. Okay. Thank you, Mr. Moat. As is so often the case on rebuttal, I'll start at the end and work back up. Judge Boggs, the key to note there on the interplay of Schedule A and Section 10 of the Trading Advisory Agreement is that termination for a material breach, such as violating the $1 million margin limit, is immediate, whereas termination under Section 10, while either party can terminate it, there is a three-day notice requirement. So while the difference is slight, there is a material difference on that. Whether the timeline adds up is a question of fact that should be determined upon remand when the case is tried on the merits, but there was certainly no waiting for a year or two because this was an agreement in January that was terminated by the end of August, and termination clearly was an optional right. It was not mandatory. And we ultimately did it when he repeatedly refused to correct the breaches, and when we determined that we were being lied to, we ultimately did it. But termination of an arrangement like this is not something to be done lightly. It's kind of like the Declaration of Independence. You don't lightly sever the bonds that bind you to another people because damages occur when you have a disruption in an arrangement like this. Is all this pleaded now in your complaint? Well, the Declaration of Independence isn't referred to, but I think the facts are pled in there, Your Honor. Schedule A and so forth. Whether we waived anything, that's a question of fact, too, that goes to the merits upon remand. What is definitely pled, Judge Seiler, is that we never approved margin above $1 million and that we ordered the margin brought back below $1 million within one day as required by the agreement, and it wasn't done. As far as the embedded tail hedge, I don't think the description by Appellee's Counsel is quite accurate. If you look at paragraph 15 of the first amended complaint, it says, Wilkinson represented that the strategy contained an embedded tail hedge, meaning it would be profitable in extreme stock market downturns. That's not couched in terms of his internal reports or anything. He said it was there. Then if you go to paragraph 69, about four lines down, the market actions and trading loss established that the trading strategy did not contain the embedded tail hedge that was claimed by Wilkinson. Risk reports by outside experts confirmed that. So there was a factual representation and it was not true. It wasn't anything subjective. Then, Your Honors, finally, if you would consult page 31 of our primary brief and pages 12 and 13 of our reply brief, you will see cases from this circuit and others in which representations of just the sort that we allege were determined to be factual representations that would support a fraud claim. And my time is up, if Your Honors have no questions. Apparently not. Thank you very much, Mr. Teich. Okay. Well, thank you, Counsel, for your arguments. I very much appreciate them. And the case will be submitted. And that completes our.